UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
THE UNITED STATES OF AMERICA,

                        Petitioner,

   -against-

                                                        18 Cr. 00802-003 (CM)

DAVID PEREZ,

                       Defendant.
------------------------------------------------------------------------X

---

## SENTENCING MEMORANDUM ON BEHALF OF

## DAVID PEREZ

---

                                                   Bernarda Villalona, Esq.
                                                 Villalona Law, PLLC
                                                 271B Cadman Plaza E., #20114
                                                 Brooklyn, NY 11201
                                                 833-845-5256
                                                 Bernarda@VillalonaLaw.com

                                                 Deborah Colson, Esq.
                                                 Moskowitz Colson Ginsberg & Schulman
                                                 80 Broad Street
                                                 New York, NY 10004
                                                 212-257-6455
                                                 dcolson@mcgsllp.com

                                                 Attorneys for David Perez

<u>BY ECF and Email</u>

The Honorable Colleen McMahon
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re: <u>U.S. v. David Perez</u>; 18 Cr. 802-03 (CM)

Dear Judge McMahon:

We submit this sentencing letter and attachments in support of a just but merciful sentence for David Perez.[1][2] Balancing Mr. Perez's traumatic personal history, drug addiction and lack of criminal history with his extreme conditions of confinement during the COVID-19 pandemic, and the excruciating injury he sustained at the Metropolitan Detention Center ("MDC"), we respectfully submit that the mandatory minimum sentence of sixty (60) months is "sufficient but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. §3553(a).

## I.

## <u>MR. PEREZ'S HISTORY AND CHARACTERISTICS</u>

Mr. Perez was born in one of the poorest towns of the Dominican Republic to teenage parents ages fifteen and seventeen. His father, Ediburgo Mercedes was an alcoholic. His mother, Blasina Sanchez, was barely around. Mr. Perez was led to believe that she could not care for him because she was working. Mr. Perez is aware that he has several siblings, but he was not raised with them. Because his parents were too young to care for him, he was passed around between

---

[1] Mr. Perez's birth name is Alex De Los Santos Sanchez.
[2] Bernarda Villalona is a member of the EDNY CJA Mentoring Program. Ms. Villalona participated in the defense of Mr. Perez by conducting research, participating in client interviews, reviewing discovery, and drafting this sentencing memorandum.

1

family members and did not receive an education. PSR ¶ 105. At one point, he lived with an uncle who repeatedly took his frustration out on Mr. Perez's body. Mr. Perez still has scars on the back of his head and back from being beaten by chairs, belts, and cords. He also suffers from mild memory loss, which is likely the result of a beating. *Id* at ¶ 114.

Beginning at the age of five, Mr. Perez was forced to walk the streets and earn money by shining shoes. As he got older, he progressed to small painting projects and collecting scrap metal. Around the age of nine, he began working for a man who would take him around the Dominican Republic to complete painting jobs. The man sexually abused Mr. Perez on several occasions. Mr. Perez did not know what to do and had no one to turn to. Where were his parents? Who would allow their young child to be in the streets and especially with strangers?

At age twelve, Mr. Perez met an older teenager in the streets who asked if he wanted to go to Puerto Rico. Mr. Perez thought the boy was joking. He had heard stories of life in the United States but never thought he could get there. This friend told him about a boat that was leaving in the next few days. Feeling abandoned and tired of jumping from house to house, worrying about his next meal, or whether he would be physically or sexually abused, Mr. Perez decided to take the journey to Puerto Rico. He boarded a boat several days later with no money, family support, or plan.

Upon his arrival, Mr. Perez rented a room and began looking for work. He found some painting jobs and apprenticed at an auto-body shop. Eventually, he settled down with a family he had met through the boy who took him to Puerto Rico. PSR ¶ 108. This same family provided him with the identity of David Perez, which he later used to travel to New York. *Id.*

In 2007, while visiting New York, Mr. Perez met and began dating Michelle Figueroa. PSR ¶ 108. A year later, she gave birth to their son, J.F. Shortly after J.F. was born, Mr. Perez

2

relocated to New York to live with his new family. Mr. Perez and Ms. Figueroa remained together for several years. Eventually, however, she won some money in a lawsuit and moved away, taking J.F. with her. *Id.* at ¶ 109. Mr. Perez desperately wanted to remain connected to his son, but Ms. Figueroa refused to let him visit. *Id.* at ¶ 119. Alone again, he sunk into a deep depression and fell prey to drugs, including marijuana and heroin. They numbed his pain and helped him to endure the loneliness. *Id.*

His substance abuse continued for years and eventually led to his participation in the drug trafficking organization described below.

## II.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Perez pled guilty on May 10, 2022, to the lesser included offense of conspiracy to distribute and possess with the intent to distribute 100 grams of heroin, in violation of 21 U.S.C. §§ 846 and 841 (b)(1)(B). The charge stems from his participation between 2016 and 2018 in a drug trafficking organization ("DTO") that operated in the Washington Heights section of Manhattan. Mr. Perez was considered a nighttime manager of the DTO and served as a pitcher doing hand-to-hand sales. PSR ¶¶ 73, 75. Because he worked at night, he was able to satisfy his addiction without the risk of others noticing.

Mr. Perez was not motivated by greed or the desire to live an extravagant lifestyle. Rather, his actions were fueled by his addiction and admittedly poor decision to provide for himself at a time when finding work was especially difficult because of his immigration status. *See* Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993) ("The defendant's motive for committing the offense is one important factor.").

3

Mr. Perez accepts full responsibility for his offense. He also acknowledges that he should have self-surrendered after his co-defendants were arrested in 2018, but he was terrified of being deported. After the DTO was taken down, Mr. Perez moved to the Bronx in search of a fresh start. He found a stable job repairing boilers for a company called Stadium Iron Works, *see* PSR ¶ 123, and his earnings enabled him to rent a room and cover his basic needs. He remained employed, heroin free, and arrest free for the next three years until his arrest on October 6, 2021.

Mr. Perez's boss and co-workers were shocked to learn of his participation in the instant offense, especially given his hard work, reliability, and "loving" nature. *See* Exhibit A. But they have remained supportive. "During his tenure, David['s] professionalism and compassion was admired and appreciated," writes his boss, Desidee Block. *Id.* "[T]he inherited family at the Stadium are here to support him to ensure he makes the most of his second chance." *Id.*

### III.

### A CONSIDERATION OF THE SENTENCING FACTORS WARRANTS LENIENCY

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Among the factors to be considered at sentencing are: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

The Supreme Court has held a sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

4

sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 562 U.S. 476, 487 (2011) (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the judge "may not presume that the Guidelines range is reasonable." Gall v. United States, 552 U.S. 38, 39 (2007). Rather, district courts are required to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id.* at 39.

Multiple factors warrant the Court's leniency here.

### A. TRAGIC PERSONAL HISTORY AND DRUG ADDICTION

First, Mr. Perez has a tragic personal history. He is not the first defendant in this district to experience childhood poverty. Unlike many others, however, he endured multiple childhood traumas, including parental abandonment, his father's alcoholism, physical abuse at the hands of his uncle, sexual abuse by an employer, lack of identity, and homelessness in a foreign country. His personal history and lack of education impacted his mental health and relationships and left him susceptible to drug abuse, which contributed to his criminal activity.

### B. A 60-MONTH SENTENCE IS NECESSARY TO AVOID UNWARRANTED DISPARITIES IN SENTENCING

Second, a 60-month sentence is necessary to avoid unwarranted disparities in sentencing. Only three defendants in the case have received sentences above 60 months, Pedro Vicioso de Lima, Victor Hidalgo, and Jacinto Garcia. Vicioso de Lima and Hidalgo were both more culpable than Mr. Perez, and Garcia has a lengthy criminal record.

Vicioso de Lima, who was sentenced to 180 months, was the leader and head of the DTO and controlled the DTO's operations. PSR ¶ 14.

Hidalgo, who received a sentence of 120 months, was second-in-command and the "General Manager." *Id.* at ¶ 24. He was responsible for managing and collecting drug proceeds

and distributing heroin to DTO members for sale. *Id.* He was also associated with two stash houses used by the DTO. *Id.* at ¶ 25. Hidalgo has a criminal record involving a loaded firearm and a controlled substance offense. (See Letter from AUSA Jessica Greenwood, Aline Flodr, and Dominic A. Gentile to the Honorable Colleen McMahon, dated May 29, 2020 at 4, Dkt. No. 196).

Garcia received a sentence of 72 months. As a middle manager, his role in the offense was similar to Mr. Perez's. *Id.* at ¶ 40. He supervised lookouts and generally worked the morning shifts. *Id.* Unlike Mr. Perez, however, Garcia has a lengthy criminal record resulting in long periods of incarceration from 1986 to 1987 and again from 1989 to 1992. (See Letter from Ken Womble, Esq. to the Honorable Colleen McMahon, dated August 29, 2019 at 3, Dkt. No. 97).

Given the differences in his role and criminal history, Mr. Perez should receive a lower sentence than each of the above defendants.

C. **MR. PEREZ SUFFERED A DEBILITATING INJURY AT THE MDC**

Third, Mr. Perez suffered a debilitating injury at the MDC. On October 26, 2021, just twenty days after his arrest, he slipped and fell as he was climbing down from the top bunk during a count, injuring his back and knee. PSR at ¶ 115. Minutes later, as he was still lying on the floor, a guard unlocked the cell door and hit his head with the metal door frame. When counsel visited Mr. Perez a few days later, he was walking with crutches and complained of excruciating back and leg pain. He also had a severe headache and a visible knot on his forehead. He told counsel that he was unable to sleep, could barely eat, and could not care for himself. He also said he had pulled a towel drenched in blood from his rectum.

Over the next several months, Mr. Perez's mobility became increasingly limited, and he continued to complain of severe pain. Eventually, he could no longer walk, even with crutches,

and was confined to a wheelchair. MDC health staff provided Mr. Perez with several different pain medications, including Tramadol, but nothing sufficed. On one occasion, he was administered an injection to treat the pain, but he had an adverse reaction and landed in the hospital. PSR ¶ 115, Exhibit B[3]. An MRI on February 16, 2022, revealed that he had multiple herniated disc and a pinched nerve. *Id*.

In June 2022, eight months after the injury, Mr. Perez was finally taken to Kingsbrook Jewish Medical Center where he was diagnosed with spinal stenosis with neurogenic claudication, a chronic post-traumatic headache, and mild cognitive impairment with memory loss. *Id*. Spinal stenosis compresses the nerve roots that control sensation and movement in the lower body, which can cause pain, tingling, or cramping. *See* Columbia University, *Neurogenic Claudication*.[4] Neurogenic claudication, which is usually caused by spinal stenosis, is a narrowing of the spinal canal. *Id.*

While at Kingsbrook, Mr. Perez was treated with pain medication and physical therapy, but his condition failed to improve. *Id.* He remained bedridden until late October 2022, when he was transferred to Brookdale Hospital for surgery. The next week, he received a laminectomy, *see id.*, which involves removing a small piece of bone in the spine to enlarge the spinal canal and relieve pressure on the spinal cord or nerves. *See* Mayo Clinic, *Laminectomy*.[5] He returned to the MDC in December 2022 and has since made a full recovery.

---

[3] Complete medical records are available upon request.
[4] Available at: https://www.neurosurgery.columbia.edu/patient-care/conditions/neurogenic-claudication#:~:text=Neurogenic%20claudication%20is%20usually%20caused,changes%20in%20the%20lower%20spine
[5] Available at: https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533#:~:text=Laminectomy%20is%20surgery%20that%20creates,the%20spinal%20cord%20or%20nerves

Mr. Perez is grateful for the treatment he received at Brookdale. But the year he spent in debilitating pain before the surgery seriously undermined his quality of life. As such, it distinguishes his experience from that of the average prisoner and is an important mitigating factor for the Court's consideration at sentencing.

### D. CONDITIONS OF CONFINEMENT: INJURY & COVID-19

Fourth, like all MDC inmates, Mr. Perez has endured brutal conditions of confinement at the MDC. Your Honor well knows the horrific conditions that visited all the prisons in this area and around the country during the COVID-19 pandemic. U.S. v. Tiffany Days, 19 Cr. 619 (CM). Mr. Perez has shared with counsel the countless days and nights his unit was on lockdown with no access to programming and severely limited access to medical care, personal hygiene, or meals. There were many nights that Mr. Perez went without food or a simple blanket to cover himself in the cold. By the time he returned to the MDC in December 2022, many of the COVID-related restrictions had been lifted. But staffing shortages and gang violence have continued to result in frequent and extended lockdowns. Mr. Perez's imprisonment under these conditions exacts a heavy toll and warrants the full extent of the Court's leniency.

Since the onset of the COVID-19 pandemic, judges in the Eastern and Southern Districts have reduced sentences based on the unduly harsh pretrial conditions of detention at the MDC and MCC. *See, e.g.*, United States v. Terrill Latney, 18 Cr. 606 (JS) (E.D.N.Y. October 5, 2020) (downward variance from 360 months to life to 240 months for a violation of 18 U.S.C. § 1959, due in part to MDC conditions during the pandemic); United States v. Saul Colon, 15 Cr. 317 (MKB) (E.D.N.Y. November 20, 2020) (downward variance from 100 to 125 months to 18 months for a violation of 21 U.S.C. § 841 (b)(1)(C), due in part to MDC conditions during the pandemic.). We urge this Court to grant a similar reduction to Mr. Perez.

### E. REHABILITATION

Fifth, while it is hard to believe that any good could come from being incarcerated at the MDC, Mr. Perez has worked to improve himself. He has successfully completed seven courses: (1) Sentry My Personal Health Journal; (2) Substance Using Behaviors Workbook; (3) Daily Life Workbook; (4) Managing My Emotions Workbook; (5) Diabetes and You Sentry Course; (6) GED Language Math Class; and (7) Core Skills Workbook. *See* Exhibit C.

### F. COLLATERAL CONSEQUENCE: DEPORTATION

Sixth, given the nature of his conviction, Mr. Perez will almost certainly be deported upon completion of his sentence. The better life he dreamed of finding in the United States is now lost to him. He will leave behind the country he knows and the people he loves, including his American-citizen son, and return to a place where he has no home and no real family support. He hopes to rekindle a relationship with his parents despite the continuing anger and frustration he feels over their abandonment. But he understands this will take time.

We ask the Court to weigh the reality of Mr. Perez's deportation heavily in his favor when arriving at a just sentence. Indeed, considering the grave hardship of deportation, a sentence above the mandatory minimum is "greater than necessary" to promote just punishment. *See* Padilla v. Kentucky, 559 U.S. 356, 373 (2010), (recognizing that deportation imposes grave consequences and likening "the severity of deportation" to "the equivalent of banishment or exile."); United States v. Thavaraja, 740 F.3d 253, 263 (2d Cir. 2014) ("[A] district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family.").

9

### G. RESPECT. DETERRANCE. PUBLIC SAFETY.

Finally, Mr. Perez will tell Your Honor at sentencing that he is remorseful for his actions and committed to living a law-abiding life. He knows what he did is wrong and regrets it deeply. His time at MDC has helped him realize all that he has lost and will likely continue to lose. Accordingly, we respectfully submit that nothing will be gained by extending his prison beyond the mandatory sixty months.

## IV.

## CONCLUSION

After consideration of all the factors set forth in 18 U.S.C. § 3553(a), the mandatory minimum sentence of 60 months is "sufficient but not greater than necessary" to accomplish the goals set forth in the Sentencing Guidelines.

Dated: March 7, 2023
    Brooklyn, New York

Respectfully submitted,

/s/_____
Bernarda Villalona, Esq.

/s/_____
Deborah Colson, Esq.

AUSA Aline R. Flodr; (By ECF and Email)
AUSA Dominic A. Gentile (By ECF and Email)
David Perez (By Regular Mail)